# EXHIBIT 8

CERTIFIED COPY

IN THE UNITED STATES DISTRICT COURT

FOR THE SOUTHERN DISTRICT OF TEXAS

HOUSTON DIVISION

FAROUK SYSTEMS INC. )
)
)
vs. )        CIVIL ACTION NO.:
)        4:15-cv-00465
)
AG GLOBAL PRODUCTS, LLC )
d/b/a FHI HEAT, LLC and )
SHAUKY GULAMAN )
)
_____ )

<u>VIDEOTAPED DEPOSITION OF DARLENE ALLISON, VOL. I</u>

Taken on January 26, 2016



Court Reporting • Video • Trial Presentation

LA 310.230.9700 • SF 415.445.0105

els@elitigationservices.com • www.elitigationservices.com

Darlene Allison

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FAROUK SYSTEMS INC.          )
                             )
                             )
VS.                          )     CIVIL ACTION NO.:
                             )     4:15-cv-00465
                             )
AG GLOBAL PRODUCTS, LLC      )
d/b/a FHI HEAT, LLC and      )
SHAUKY GULAMANI              )

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

ORAL AND VIDEOTAPED DEPOSITION OF

DARLENE ALLISON

January 26, 2016

Volume 1

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*



     ORAL AND VIDEOTAPED DEPOSITION OF DARLENE ALLISON,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

numbered cause on the 26th day of January, 2016, from

1:19 p.m. to 6:15 p.m., before Abigail Guerra, CSR, in

and for the State of Texas, reported by machine

shorthand, at the offices of Mr. Andrew Pearce, Boyar

Miller, One Grove Street, 2925 Richmond Avenue, 14th

Floor, Houston, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

Darlene Allison

Page 2

```
 1              A P P E A R A N C E S

 2

    FOR THE PLAINTIFF:
 3  FAROUK SYSTEMS INC.

 4  Mr. Andrew Pearce
    Boyar Miller
 5  One Grove Street
    2925 Richmond Avenue
 6  14th Floor
    Houston, Texas 77098
 7  Phone:  (713) 850-7766

 8

 9  FOR THE DEFENDANTS:
    AG GLOBAL PRODUCTS, LLC d/b/a FHI HEAT, LLC and SHAUKY
10  GULAMANI

11  Mr. Matthew L. Seror
    Buchalter Nemer
12  1000 Wilshire Boulevard
    Suite 1500
13  Los Angeles, California 90017
    Phone:  (213) 891-0700
14

15
    ALSO PRESENT:
16  Mr. Jason Rumsey
    Mr. Avery Gross, Videographer
17

18

19

20

21

22

23

24

25
```

Darlene Allison

Page 3

1                            INDEX

2

3     Appearances....................................     2

4     DARLENE ALLISON

5        Examination by Mr. Seror.....................     5

6        Examination by Mr. Pearce....................    89

7        Examination by Mr. Seror.....................    92

8     Signature and Changes...........................    95

9     Reporter's Certification........................    97

10

11

12                  PREVIOUSLY MARKED EXHIBITS

13    NO.    DESCRIPTION                              PAGE

14    36     Notice of Deposition (8 pages)            15

15    39     Facebook Post (13 pages)                  77

16                         EXHIBITS

17

18    59     Subject Image No. 1 (1 page)              51

19    60     Blog (2 pages)                            52

20    61     Polyvore Printout (5 pages)               54

21    62     Image (1 page)                            55

22    63     Email Dated February 9, 2016              57
             (3 pages)

23

24

25

Darlene Allison

1          THE REPORTER:  Good afternoon.  Pursuant to

2     Federal Rule of Civil Procedure 30(b)(5)(A), I am

3     required to begin the deposition with the following

4     on-the-record statement:  My name is Abigail Guerra.  I

5     am a certified shorthand reporter with the offices of

6     eLitigation Services, Incorporated, located at 645 West

7     Ninth Street, 110-200, Los Angeles, California 90015.

8     The date is January 26, 2016, and the time is 1:19 p.m.

9          This deposition is taking place at One Grove

10    Street, 2925 Richmond Avenue, 14th Floor, Houston, Texas

11    77098.  Present today is the deponent, Ms. Darlene

12    Allison.

13          I will now administer the oath.

14                    (Witness sworn.)

15          THE REPORTER:  Also present today are Counsel,

16    Mr. Matthew L. Seror with Buchalter Nemer, and Mr.

17    Andrew Pearce with Boyar Miller, and Avery Gross, the

18    videographer.

19          THE VIDEOGRAPHER:  Abby, thank you.  Again,

20    we're still on the record.  This is videotape No. 1 in

21    the videotaped deposition of Ms. Darlene Allison in the

22    matter of Farouk Systems vs. AG Global Products doing

23    business as FHI Heat.

24          This is being heard before the USDC Southern

25    District of Texas Court, Houston Division, Case

Darlene Allison

1   No. 4:15-CV-00465.  It's the matter number A2208-0015.

2           The deposition is being held at the law offices

3   of Boyar Miller, 2925 Richmond Avenue, 14th Floor,

4   Houston, Texas.  The witness has been sworn, so you may

5   proceed.

6           MR. SEROR:  Thank you.

7                   DARLENE ALLISON,

8   having been first duly sworn, testified as follows:

9                   EXAMINATION

10  BY MR. SEROR:

11  Q.      Good afternoon, Ms. Allison.

12  A.      Good afternoon.

13  Q.      Can you please state and spell your name for the

14  record?

15  A.      Darlene, D-A-R-L-E-N-E, Allison, A-L-L-I-S-O-N.

16  Q.      Great.

17          And you understand that you're under oath today?

18  A.      Yes.

19  Q.      Okay.  That's the same oath that you would take

20  in the court of law?

21  A.      Yes.

22  Q.      Okay.  Have you ever had your deposition taken

23  before?

24  A.      No.

25  Q.      Okay.  I'm going to go over a couple ground

Darlene Allison

1    on the page, Subject Image No. 1.

2    A.       Okay.

3    Q.       Do you recognize that image?

4    A.       Yes.

5    Q.       Okay.  And what is it?

6    A.       It's a -- a true artist.

7    Q.       And is that a post that Farouk Systems put on

8    Facebook?

9    A.       Yeah.

10   Q.       Okay.  And where did that image originate from?

11   A.       The image itself was purchased through

12   Shutterstock where Farouk has an account.  We have a

13   subscription to the Shutterstock stock images.

14   Q.       So let's -- let's look -- you said Farouk has a

15   subscription to Shutterstock?

16   A.       Yes.

17   Q.       And what is your familiarity, if any, with

18   Shutterstock?

19   A.       I just know it's a -- where you can order a

20   different type of images.

21   Q.       A clipart library kind of thing?

22   A.       A clipart-type situation.

23   Q.       And was that something that, if you're aware,

24   Cindy Lott used frequently?

25   A.       Yes.

Darlene Allison

Page 41

1    see?

2    A.       Yes.

3    Q.       Okay.  And how did that differ than what we're

4    looking at here?

5    A.       The color -- of course, I know this is black and

6    white, but you mean the original with their stock was?

7    Q.       Yes.  Yes.

8    A.       How is this one different?

9    Q.       Correct.

10   A.       It has the -- of course, you can't tell by the

11   color, that was changed, and then the quote, the "true

12   artist" quote, she inserted that.

13   Q.       So the version that she originally got from

14   Shutterstock had the scissors and the brushes on top?

15   A.       Uh-huh.

16   Q.       It had a bar on the top that those elements were

17   included, and it had that hair kind of flowing down --

18   A.       Right.

19   Q.       -- and that's what she got from Shutterstock,

20   and then if I understand you correctly, you're telling

21   me that what Cyndi added was the quote?

22   A.       Yes.

23   Q.       And she also changed the color?

24   A.       Correct.

25   Q.       Is that -- and that's all she changed?

Darlene Allison

Page 43

```
 1    to do with it if she wanted to.
 2    Q.      Okay.  And where did the quote that's listed
 3    here, where did that quote originate from?
 4    A.      I believe it's from the Internet.
 5    Q.      Do you know where?
 6    A.      No.  I know you can Google -- and she told me
 7    this as well.  You can Google salon quotes.
 8    Q.      And you'd find it there?
 9    A.      Yes.
10    Q.      And she got it from Googling?
11    A.      Yes.
12    Q.      She didn't create this quote?
13    A.      Not to my knowledge, but I don't know if that's
14    in the true exact -- I don't know if it was changed, but
15    I don't know that to my knowledge.
16    Q.      In any of your discussions with her, did she say
17    she changed the verbiage of the quote in any way?
18    A.      She did not say.
19    Q.      Did she say if she changed the punctuation of
20    the quote in any way?
21    A.      She didn't say.
22    Q.      Okay.  What about the font?
23    A.      She didn't say.
24    Q.      Okay.  So am I correct in saying that the only
25    thing she told you she did to create Subject image No. 1
```

Darlene Allison

Page 44

1   is obtain an image from Shutterstock, change the colors,

2   and add a quote, correct?

3   A.      Yes.

4   Q.      Okay.

5           MR. PEARCE:  You want to take a quick break and

6   I think I can get you that email thread for you --

7           MR. SEROR:  Yeah, let's do that.

8           MR. PEARCE:  -- before you move off of this?

9           MR. SEROR:  That's fine.  I'm going to use the

10  restroom while we're on break.

11          THE VIDEOGRAPHER:  Going off the record at 2:04.

12          (A break was taken from 2:04 p.m. to 2:11

13          p.m.)

14          THE VIDEOGRAPHER:  Back on the record at

15  2:11 p.m.

16  Q.      (BY MR. SEROR)  Okay.  And after -- during our

17  short break, Counsel did give me an email chain here,

18  which I will take a look at, but as far as the

19  scheduling issue, we're going to suspend the deposition

20  of Ms. Allison right now and pick up another one of the

21  PMK witnesses now because she has a scheduling issue.

22  She needs to get out of here by a certain time.  So

23  we're going to accommodate that schedule, suspend this

24  deposition, and pick it up when we're done with the

25  other -- the other deposition.

Darlene Allison

Page 45

1          MR. PEARCE:  We -- we appreciate you doing that,

2     Matt.

3          MR. SEROR:  Yeah.

4          THE WITNESS:  Thanks, Matt.

5          THE VIDEOGRAPHER:  Shall we go off the record?

6          MR. SEROR:  Please.

7          THE VIDEOGRAPHER:  Okay.  We're going off the

8     record.  It's the end of this part of Ms. Allison's

9     deposition at 2:12 p.m.

10         (Proceedings concluded at 2:12 p.m.)

11         THE VIDEOGRAPHER:  Back on the record at

12    5:11 p.m.  This is the continuation of Ms. Darlene

13    Allison.

14         You may proceed.

15    (BY MR. SEROR)  Thank you.

16         Good afternoon, Ms. Allison.  Thank you for --

17    for joining us again.  We've had a break, and we're

18    going to pick back up, and I'm going to try to pick up

19    seamlessly, but I probably won't, so there they may be a

20    couple of repeats, but I'll certainly do my best.

21    A.    Okay.

22    Q.    Before we took our break, we are talking Subject

23    Image No. 1, and if you want get back in front of you

24    Exhibit 36, Page 2 of 36, which is going to be the image

25    -- the images, I should say.  I believe it's this

Darlene Allison

Page 46

1   document.

2   A.      This one, yeah.

3   Q.      Okay.  And we were talking about -- we were

4   talking about Ms. Lott's source for the quote on this,

5   "A true artist wears it, walks it, and breathes it."  Do

6   you remember that -- that testimony?

7   A.      Yes.

8   Q.      Okay.  We're saying how you spoke with Cyndi

9   Lott, and it was your understanding that she got this

10  quote from another website.  You could Google salon

11  quotes, and some stuff would come up; is that right?

12  A.      That's correct.

13  Q.      And that's where you believe she obtained it?

14  A.      Yes.

15  Q.      And then she took it and added it to the clip

16  art image she got from Shutterstock and then changed

17  some colors; is that right?

18  A.      Yes.

19  Q.      Okay.  And do you know if Ms. Lott obtained

20  permission or authorization from anybody to use the

21  quote that appears on this image?

22  A.      I think they're available to anybody to --

23  Q.      And that's -- oh, I'm sorry.  Go ahead.

24  A.      I think they're available to anybody to use on

25  the Internet.

Darlene Allison

Page 66

1   link?

2   A.      Yes.

3   Q.      Okay.  And did that link you to a Shutterstock

4   website?

5   A.      Yes.

6   Q.      Okay.  And is the image you saw -- I'll ask you.

7   What is the image that you saw when you clicked on that

8   link?

9   A.      On the Shutterstock, it's the one we discussed

10  earlier that had more of a different color.  It was a

11  peach color.  It was just the image, no language, no

12  quote.

13  Q.      So it was the -- a square image with -- and it

14  had a color on it, and then there was top horizontal bar

15  across the top which had a different color?

16  A.      Yes.

17  Q.      And there were a comb and scissors and another

18  brush lined up in a linear fashion on that horizontal

19  bar?

20  A.      Yes, sir.

21  Q.      And then there's kind of black hair graphic, so

22  to speak, kind of going across the entire image?

23  A.      Yes.

24  Q.      Okay.  And that's what you saw when you clicked

25  on that Shutterstock link?

Darlene Allison

1    A.       Yes.

2    Q.       And then she says, "It's probably on Facebook,

3    too, I just missed it."

4             Do you know what she's referring to here when

5    she says, "It's probably on Facebook"?

6    A.       I'm not sure.  What she means.

7    Q.       Did you ever have any follow-up discussions with

8    her on that point?

9    A.       No.

10   Q.       Okay.  So then she says "their post," and is

11   that the FHI heat post?

12   A.       Yes.

13   Q.       Okay.  And then did you click on that link?

14   A.       Yes.

15   Q.       Okay.  And then she says, "My original

16   creation."  There's another link, correct?

17   A.       Yes.

18   Q.       And is that the one that we're looking at in

19   Paragraph E of Exhibit 36?

20   A.       Yes.

21   Q.       Okay.  On Pinterest they just have the same

22   graphic pinned from Instagram.  Do you see that?

23   A.       Yes.

24   Q.       And there are two links to what appear to be

25   Pinterest pages?

Darlene Allison

Page 71

1    guess, I'd say probably filing a lawsuit.

2    Q.      And were you involved in the filing of that

3    lawsuit?

4    A.      No, sir.

5    Q.      Okay.  You didn't draft it or review draft in

6    any way?

7    A.      No, sir.

8    Q.      Okay.  So now I'd like to move on to Subject

9    Image No. 2, which again you'll see pictured on

10   Exhibit 36, Paragraph F.

11   A.      Okay.

12   Q.      Okay.  Now, do you recognize this image?

13   A.      Yes.

14   Q.      And how do you recognize it?

15   A.      That was included in Cyndi's email.

16   Q.      And that was the email we just looked at?

17   A.      Yes.

18   Q.      And was that email the first time you recall

19   seeing this image?

20   A.      It was the first time I saw it.  She brought it

21   to our attention.

22   Q.      Okay.  Are you -- are you a Facebook user?

23   A.      No.

24   Q.      No.  Okay.  I was going to ask you -- are you

25   active on any social media?

Darlene Allison

Page 72

```
 1    A.        Sometimes I'll look at Instagram, but not
 2    really, no.
 3    Q.        That's fair.  My only -- and I wasn't meaning to
 4    pry.
 5              My only question is whether you are familiar
 6    with Farouk Systems putting out these kinds of images on
 7    social media?
 8    A.        Am I aware of it?
 9    Q.        Yes.
10    A.        I know that we do it, yes, sir.
11    Q.        Okay.  Now, do you know where this image,
12    Subject Image No. 2, where it came from?
13    A.        I think Cyndi said it was also under the salon,
14    where you can search on the Internet, the salon quotes,
15    hair salon quotes.
16    Q.        So would I be accurate to assume that Cyndi Lott
17    put this together?  This image together?
18    A.        Yes.
19    Q.        And she told you that she put this image
20    together?
21    A.        Yes.
22    Q.        Did she do it on some sort of computer program?
23    A.        I don't know.
24    Q.        And does that -- with respect to Subject Image
25    No. 1, do you know if she developed that with a computer
```

Darlene Allison

Page 73

1    program?

2    A.        The language on that?

3    Q.        Well, I know, she got the template for it from

4    Shutterstock, but then you said she added the quote.

5    I'm just wondering if you know physically how she was

6    able to superimpose the text on that graphic.

7    A.        I don't know other than I know it's a vector

8    file, and she's able to manipulate.

9    Q.        Okay.  Okay.  So -- so going to Subject Image

10   No. 2, do you know how Cyndi developed this image?

11   A.        No.

12   Q.        Okay.  Do you know where any of the various

13   elements came from?

14   A.        No.  I just remember she told me it was a custom

15   creation that she did.

16   Q.        Okay.  So Cyndi said it was custom creation?

17   A.        Yes.

18   Q.        And when did she tell you that?

19   A.        Probably early last year sometime.  I don't know

20   exactly the date.

21   Q.        Would it have been roughly around when those

22   emails were being sent we were looking at?

23   A.        Possibly.

24   Q.        Okay.  Did she say what was custom about it?

25   A.        The snips of hair at the bottom.  I know she

Darlene Allison

1    added that, and I believe she said changed the logo and

2    maybe the placement of the quote.

3    Q.      When you say "logo," what are referring to?

4    A.      Not the logo.  I'm sorry.  The -- the language

5    on top of the image.  Whatever you call this.  The

6    quote.

7    Q.      Okay.

8    A.      The quote.  I'm sorry.

9    Q.      So the scissors and snips of hair?

10   A.      Yes.  And then the "snips of wisdom," she added

11   that.

12   Q.      And that's on the top right hand portion?

13   A.      Yes.

14   Q.      And you said she added that?

15   A.      Yes.

16   Q.      And then the quote is also obviously there?

17   A.      Yes.

18   Q.      Okay.  And is it your understanding that Cyndi

19   is the one who took the quote and the "snips of wisdom"

20   and the scissors and the hair and put it altogether into

21   this final image?

22   A.      Yes.

23   Q.      And do you have that understanding based on your

24   conversation with her?

25   A.      Yes.

Darlene Allison

Page 75

1   Q.      Okay.  And did she tell you that the hair and
2   the scissors, that element you see on the bottom of this
3   image, if that was a common image or graphic she used on
4   social media posts?
5   A.      She did not say.
6   Q.      Do you know if that's common image that she used
7   to use on social media?
8   A.      I don't know.
9   Q.      What about the "snips of wisdom"?  Do you know
10  if that is a -- a -- if that's verbiage that she would
11  frequently put on social media posts?
12  A.      Yes, she did.
13  Q.      She did?
14  A.      Uh-huh.
15  Q.      Okay.  And do you have -- do you know that from
16  conversations with her?
17  A.      Yes.
18  Q.      Okay.  So as you understand, Farouk Systems
19  didn't buy this image, correct?
20  A.      I don't think so, no.
21  Q.      Okay.  And the individual -- like the scissors
22  and the hair, do you know if Cyndi hand drew that or if
23  she got those images from other sources?
24  A.      I don't know.
25  Q.      Do you know if she got it from Shutterstock?

Darlene Allison

Page 76

```
 1   A.        She didn't say.

 2   Q.        Okay.  So when was this post put on Farouk's

 3   social media?

 4   A.        I don't know the date.

 5   Q.        Okay.  Do you know approximately when?

 6   A.        No, I don't.

 7   Q.        Okay.  Do you know on what social media

 8   platforms this image was posted on?

 9   A.        I don't know off the top of my head, no.

10   Q.        Okay.  Was it on -- do you know if it was

11   Facebook?

12   A.        It could be.  I don't know.  It could be

13   Facebook, Instagram, Twitter, any of those that we used.

14   I don't know for certain which exact sites.

15   Q.        Do you know how many times this image was used?

16   A.        No, sir, I don't.

17   Q.        Do you know if this image was ever displayed on

18   your website?

19   A.        I don't know that.

20   Q.        Do you know if this image was ever displayed

21   with or on a product?

22   A.        I have not seen that.

23   Q.        The quote that's here is a Pablo Picasso quote,

24   correct?

25   A.        That's correct.
```

Darlene Allison

Page 77

1    Q.      Okay.  Do you know if Cyndi ever obtained any

2    sort of authorization from Pablo Picasso or anyone

3    associated with Pablo Picasso to use his quote in this

4    manner?

5    A.      I don't know.

6    Q.      Okay.  I think you testified earlier that Farouk

7    Systems frequently uses quotes in social media posts; is

8    that right?

9    A.      Yes.

10   Q.      Are they usually done under this "snips of

11   wisdom" verbiage?

12   A.      That was something that Cyndi created, the

13   "snips of wisdom."

14   Q.      Okay.  And I want to show you what we've

15   previously marked as Exhibit 39.  It should be in your

16   stack probably here.  Here it is.

17   A.      Okay.

18   Q.      Exhibit 39.  Please take a look at that.  Now,

19   this appears to be -- well, let me ask you:  Do you know

20   what these collection of pages are?

21   A.      It looks like various quotes, various "snips of

22   wisdom."

23   Q.      Okay.  And does this appear that they were

24   posted on the Farouk Systems's Facebook page?

25   A.      According to the language at the bottom, yes.

Darlene Allison

Page 80

1    Lott approved Subject Image No. 2 before it was posted?

2    A.      I don't know.

3    Q.      And I asked you, and I think you said, that you

4    were generally aware of -- well, no.  I don't know if I

5    asked you.

6            At some point in time, did you search this

7    quote?

8    A.      The Picasso quote?

9    Q.      Yes.

10   A.      I didn't search for it specifically, no.

11   Q.      Okay.  Are you aware that third parties are also

12   using this quote?

13   A.      I have no idea.

14   Q.      Okay.  Is your understanding that Farouk Systems

15   has the exclusive right to use the Picasso quote?

16   A.      Do we have the authority to use it?

17   Q.      The exclusive right.

18   A.      Exclusive right?  I don't know.

19   Q.      Okay.  Do you believe you have the authority to

20   use it?

21   A.      Yes.

22   Q.      And what do you base that understanding on?

23   A.      Because I think a lot of these quotes are

24   available to anybody on the Internet.

25   Q.      And that's what you base your understanding as

Darlene Allison

Page 81

1    to the authority?

2    A.        Yes.

3    Q.        Okay.  And I think I asked you this, but I'm not

4    sure.  Did Farouk Systems use this quote or this image

5    in connection with any specific product?

6    A.        Not to my knowledge.

7    Q.        Okay.

8              MR. SEROR:  Let's go off the record for a

9    moment.

10             THE VIDEOGRAPHER:  Going off the record at 5:59.

11             (A break was taken from 5:59 p.m. to 6:01

12             p.m.)

13             THE VIDEOGRAPHER:  Back on the record.  It's

14    6:01.

15    (BY MR. SEROR)  Okay.  And before I conclude my

16    questioning, I just had a brief conversation with

17    counsel, and Plaintiff is not producing a witness today

18    or this week in response to Topics 5, 11, and 17 of the

19    Deposition Notice, all of which seek a person most

20    knowledgeable related to damages sustained by Plaintiff

21    as a result of the alleged copyright infringement.

22             Counsel and I have spoken on the topic, and

23    Counsel has indicated the reason he's not going to be

24    present a witness on this topic is that the only damages

25    being sought by plaintiff on the copyright claims is

Darlene Allison

Page 82

1    injunctive relief and statutory damages as provided on

2    the Copyright Act.  So with that agreement in place --

3    and I understand his objection, and that's fine, and

4    we'll move on.

5           Is that accurate, Andrew?

6           MR. PEARCE:  Agreed.

7    (BY MR. SEROR)  Okay.  So let's just finish up.  Now,

8    Ms. Allison, I appreciate your patience.  You also

9    designated with respect to communications with third

10   parties related to each of these images.  Are you

11   aware -- I'm going to focus on Subject Image 1, first --

12   are you aware of whether Farouk Systems has received any

13   communications from any third parties related to Subject

14   Image No. 1?

15   A.      I don't think so.

16   Q.      Okay.  And that would include anybody

17   communicating with you with respect to the quote or any

18   of the other imagery on that, correct?

19   A.      Correct.

20   Q.      Okay.  And have you -- or said more clearly --

21   has Farouk Systems communicated with any third party

22   aside from in the context of this lawsuit, to plaint- --

23   to Defendant by filing the lawsuit with respect to

24   Subject Image No. 1?

25   A.      No.

# EXHIBIT 9

Stuart Feldshon
Volume I

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

FAROUK SYSTEMS INC.            )
                              )
                              )
VS.                           )   CIVIL ACTION NO.:
                              )   4:15-cv-00465
                              )
AG GLOBAL PRODUCTS, LLC       )
d/b/a FHI HEAT, LLC and       )
SHAUKY GULAMANI               )

*************************************************************
ORAL AND VIDEOTAPED DEPOSITION OF

STUART FELDSHON

January 28, 2016

Volume 1

*************************************************************

        ORAL AND VIDEOTAPED DEPOSITION OF STUART FELDSHON,

produced as a witness at the instance of the Defendants,

and duly sworn, was taken in the above-styled and

numbered cause on the 28th day of January, 2016, from

9:16 a.m. to 12:04 p.m., before Abigail Guerra, CSR, in

and for the State of Texas, reported by machine

shorthand, at the offices of Mr. Andrew Pearce, Boyar

Miller, One Grove Street, 2925 Richmond Avenue, 14th

Floor, Houston, Texas, pursuant to the Federal Rules of

Civil Procedure and the provisions stated on the record

or attached hereto.

Stuart Feldshon
Volume I

Page 2

```
 1                  A P P E A R A N C E S

 2
      FOR THE PLAINTIFF:
 3    FAROUK SYSTEMS INC.

 4    Mr. Andrew Pearce
      Boyar Miller
 5    One Grove Street
      2925 Richmond Avenue
 6    14th Floor
      Houston, Texas 77098
 7    Phone:  (713) 850-7766

 8    FOR THE DEFENDANTS:
      AG GLOBAL PRODUCTS, LLC d/b/a FHI HEAT, LLC and SHAUKY
 9    GULAMANI

10    Mr. Matthew L. Seror
      Buchalter Nemer
11    1000 Wilshire Boulevard
      Suite 1500
12    Los Angeles, California 90017
      Phone:  (213) 891-0700
13
      ALSO PRESENT:
14    Mr. Jason Rumsey
      Mr. Avery Gross, Videographer
15

16

17

18

19

20

21

22

23

24

25
```

Stuart Feldshon
Volume I

Page 3

1                            INDEX

2

3     Appearances...................................    2

4     STUART FELDSHON

5        Examination by Mr. Seror                       5

6     Signature and Changes.........................  141

7     Reporter's Certification......................

8

9              PREVIOUSLY MARKED EXHIBITS

10    NO.    DESCRIPTION                            PAGE

11    36     Notice of Deposition     (8 pages)      19

12    41     Plaintiff's Objections and Answers to   28
             Defendant AG Global Products, LLC's
13           First Set of Interrogatories (10
             pages)
14

15

16

17

18

19

20

21

22

23

24

25

Stuart Feldshon
Volume I

Page 4

1          THE REPORTER:  Good morning.  Pursuant to

2     Federal Rule of Civil Procedure 30(b)(5)(A), I am

3     required to begin the deposition with the following

4     on-the-record statement.  My name is Abigail Guerra.  I

5     am a certified shorthand reporter with the offices of

6     eLitigation Services, Inc., located at 645 West Ninth

7     Street, 110-200, Los Angeles, California 90015.  The

8     date is January 28, 2016, and the time is 9:16 a.m.

9     This deposition is taking place at One Grove Street,

10    2925 Richmond Avenue, 14th Floor, Houston, Texas 77098.

11    Present today is the deponent, Mr. Stuart Feldshon.  I

12    will now administer the oath.

13                    (Witness sworn.)

14        Also present today are counsel Mr. Matthew L. Seror

15    with Buchalter Nemer and Mr. Andrew Pearce, with Boyar

16    Miller, and Jason Rumsey; and Avery Gross, the

17    videographer.

18          THE VIDEOGRAPHER:  This begins file No. 1 in the

19    video deposition of Mr. Stuart Feldshon.  Again, we are

20    on the record.  Today's date January 28th, 2016.  This

21    deposition is being taken at the law offices of Boyar

22    Miller, 2925 Richmond Avenue, Houston, Texas, 77098.

23    This is the matter before the USDC Southern District of

24    Texas, Houston Division, Case No. 4:15-CV00465.  The

25    matter number is A, Adam, 2208-0015.  The witness has

Stuart Feldshon
Volume I

Page 5

1   been sworn.

2           You may begin.

3           MR. SEROR:  Thank you.

4                   STUART FELDSHON,

5   having been first duly sworn, testified as follows:

6                   EXAMINATION

7   BY MR. SEROR:

8   Q.      Good morning, Mr. Feldshon.

9   A.      Good morning.

10  Q.      How are you?

11  A.      Fine.  Thank you.

12  Q.      Can you please state and spell your name for the

13  record, please.

14  A.      Stuart Feldshon.  First name S-T-U-A-R-T.  Last

15  name F-E-L-D-S-H-O-N.

16  Q.      Thank you.

17          You understand that you're under oath today?

18  A.      Yes.

19  Q.      And that is the same oath you would take in a

20  court of law?

21  A.      Yes.

22  Q.      Have you ever had your deposition taken before

23  Mr. Feldshon?

24  A.      Yes.

25  Q.      How many times?

Stuart Feldshon
Volume I

Page 9

1    shoulders, uh-huh, uh-huh, things like.  So it's

2    important to only give verbal responses and make sure we

3    have a clear record.  Do you understand that?

4    A.       Yes.

5    Q.       Okay.  Now, is there any reason that you cannot

6    give your best and accurate testimony today?

7    A.       No.

8    Q.       Okay.  Are you employed?

9    A.       Yes.

10   Q.       And where are you employed?

11   A.       Farouk Systems.

12   Q.       And what is your title at Farouk Systems?

13   A.       Senior vice president of North American sales.

14   Q.       How long have you been employed by Farouk

15   Systems?

16   A.       17-and-a-half years.

17   Q.       And have you held the title of senior vice

18   president North American sales for that entire time?

19   A.       No.

20   Q.       Okay.  So when you started at Farouk Systems --

21   and it's about 1999 thereabouts?

22   A.       '98, yeah.

23   Q.       '98.

24            What was your title at that point?

25   A.       Regional sales manager.

Stuart Feldshon
Volume I

Page 26

1    Q.       Fair enough.   Besides your -- your discussions

2    with customer service and Jan Coy, did you speak with

3    anyone else in preparation for today's --

4    A.       No.

5    Q.       And you said you didn't receive any documents

6    from the people you just spoke of.   Did you review any

7    of your documents or any reports that you had access to

8    in order to prepare for today?

9    A.       No.

10   Q.       Okay.   Was there anybody that you wanted speak

11   to in preparation for your deposition, but just weren't

12   able to reach them or didn't get a chance to talk to

13   them?

14   A.       No.

15   Q.       Okay.   Okay.   Now, do you understand, sir, that

16   this case is about Farouk Systems claimed trade dress?

17   A.       Yes.

18   Q.       And do you understand what I -- what I mean when

19   I say "trade dress"?

20   A.       Yes.

21   Q.       And what is your understanding of that term?

22   A.       The packaging, the look of the packaging, and

23   the actual product itself.

24   Q.       And is it your understanding that the trade

25   dress at issue in this case is related to one specific

Stuart Feldshon
Volume I

Page 27

1    line of products that Farouk Systems sells?

2    A.      Yes.

3    Q.      And what line is that?

4    A.      Our Chi tools.

5    Q.      No other line that you're aware of?

6    A.      No.

7    Q.      Okay.  And when you're talking about trade

8    dress, you said you're familiar with the term.  What do

9    you understand Farouk Systems' trade dress to be?

10   A.      Black and red.

11   Q.      Any other colors besides black and red?

12   A.      That's our main colors.  That's what we have as

13   a constant for all our tools.

14   Q.      Any other colors that are used that you consider

15   to be trade dress?

16   A.      We have in the past.  We had our Nano irons and

17   dryers, which was like a metallic-type blue.

18   Q.      Was it solid blue or any other colors besides

19   that?

20   A.      It had the Chi logo in red on the -- on the

21   little circle there.

22   Q.      And other than this metallic blue you're talking

23   about, any other colors you can think of?

24   A.      Well, we make limited editions for different

25   customers, so yes.

Stuart Feldshon
Volume I

Page 28

 1   Q.      And are those -- and we got some testimony

 2   yesterday which I know that you weren't here for, but we

 3   heard that any given time a customer may ask for a pink

 4   iron or maybe an iron with skulls on it.  Is that what

 5   you're referring?

 6   A.      Yes.

 7   Q.      But when we're talking trade dress, you

 8   understand it to be the black and red?

 9   A.      Yes.

10   Q.      On the Chi tool line?

11   A.      Yes.

12   Q.      Okay.  And there are a number of different

13   products within the Chi tool line, correct?

14   A.      Yes.

15   Q.      Number of different -- well, strike that.

16           I'd like to turn your attention now to

17   Exhibit 41, which should also be in front of you, and

18   I'm going to ask you to turn to page page 4 of that

19   document.  Now, what you're looking at -- well, let me

20   back up.  Have you ever seen this document before?

21   A.      Yes.

22   Q.      And when did you see it?

23   A.      Yesterday.

24   Q.      Okay.  And did you see it at any point before

25   yesterday?

Stuart Feldshon
Volume I

Page 36

1   Q.        -- but Chi Air has been around for a long, long

2   time?

3   A.        Yes, yes.

4   Q.        And did she give you any indication or do you

5   know, are we talking 2 years?  10 years?  20 years?

6   A.        The Chi Air line is about three or four months

7   old, that particular one.

8   Q.        And what about the line --

9   A.        Excuse me.

10  Q.        What about the line total?  Is that around --

11  you said "a long time."  Can you give me some estimate

12  of what you mean by "a long time"?

13  A.        Chi Air has been around since 2008.

14  Q.        And what about Chi Smart?  Do you know how long

15  that line has been?

16  A.        Chi Smart has been around, excuse me, I believe

17  since around 2010.

18  Q.        Okay.  Now, you indicated that all of the items

19  on this list, with the exception of Chi Smart and Chi

20  Air, you were aware of them still being sold --

21  A.        Yes.

22  Q.        Again, there's the Hand Shot exception, which I

23  appreciate.  Okay?

24            And do you know when each one of these products

25  was first sold?

Stuart Feldshon
Volume I

Page 37

1    A.      I can give some, but I can't give all.

2    Q.      Well, let's go through, do what you know.

3    A.      Okay.  When they first started, the original Chi

4    flat iron started in 2009.

5    Q.      The Chi flat iron.  Okay.

6    A.      I can't give exact dates, but I can come around.

7    Q.      That's fine.  I'm not -- I'm not going to hold

8    you to months and days, but if you can give me -- the

9    best you can give me is fine.

10   A.      Chi Pro dryer started in 2003.  Chi Touch dryer

11   was 2011.

12   Q.      Chi -- hold on.  Chi Touch.  So here there's Chi

13   Touch dryer, 2011?

14   A.      Yes.  Dura Chi is 2014.  Chi Arc is 2012.  Chi

15   Escape is 2013.  I see Chi Touch twice.

16   Q.      I was going to ask you about that.  I see a Chi

17   Touch and a Chi Touch dryer.  As far as you know, are

18   those the same thing?

19   A.      Well, there's a Chi Touch 2 that we just -- we

20   just launched in 2014.

21   Q.      Okay.  So the Chi Touch that you said was 2011,

22   there's an original Chi Touch?

23   A.      That's the 2011.

24   Q.      And then there's a Chi Touch 2?

25   A.      Which is the -- like the iPhone 6.

Stuart Feldshon
Volume I

Page 41

1   well, is that just one stand-alone product as well, or

2   there's different versions?

3   A.      There's different sizes.

4   Q.      Different sizes of the same product?

5   A.      Yes.

6   Q.      Is that a curling iron?

7   A.      Yes.

8   Q.      Okay.  So kind of similar to the one on the top,

9   the Turbo Digital Ceramic curling iron.  They're

10  different sizes?

11  A.      Different sizes.  The Orbit is more of a styling

12  tool that you can do differential looks with.

13  Q.      Okay.

14  A.      It's a stand-alone wand.

15  Q.      Okay.  And did all those different sizes come

16  out at the same time?

17  A.      Yes.

18  Q.      Okay.  So I also see the Chi Escape, you said in

19  2013, and I'm aware that there are different products

20  under the Chi Escape line.

21  A.      Yes.  The flat iron was first, and then early

22  2014 was the curling iron.

23  Q.      Any other products under that Chi Escape line?

24  A.      No.

25  Q.      Okay.  Dura Chi we talked about.  The original

Stuart Feldshon
Volume I

Page 42

1    Chi flat iron, you said that was 2001?

2    A.      Yes.

3    Q.      Okay.  And that -- that iron has been consistent

4    in appearance since 2001?

5    A.      Yes.

6    Q.      The Chi Rocket hair dryer, there's only --

7    that's a stand-alone product?  There's no other --

8    other --

9    A.      Correct.

10   Q.      -- products under that line?

11   A.      No.

12   Q.      The same is true for the Pro Hair dryer?

13   A.      Yes.

14   Q.      Okay.  What about the G2 flat iron?

15   A.      The G2 flat iron has two different sizes, a one

16   inch and a one-and-a-half inch.

17   Q.      And I think that was one of the ones you didn't

18   know the day, but do you believe those launched at the

19   same time?

20   A.      No.  I believe the one inch may have been first.

21   Q.      And the other one came after?

22   A.      Yes.

23   Q.      Okay.  Besides those two, any other variations

24   on that line?

25   A.      No.

Stuart Feldshon
Volume I

Page 77

1    of any efforts that the company may take against the

2    third party for the use of the colors red and black?

3    A.      No.

4    Q.      Okay.  Moving on to No. 32, instances of

5    confusion among consumers as between the products of

6    Farouk Systems that bear your trade dress, which we

7    talked about as red and black, and any product of the

8    defendant?

9    A.      Yes.

10   Q.      Okay.  Are you aware of any instances of

11   confusion between the products of Farouk Systems and the

12   products of the Defendants?

13   A.      Yes.

14   Q.      And what instances of that confusion are you

15   aware of?

16   A.      One in particular was at the IBS, New York.  I

17   happened to be at that show, and one of the young ladies

18   that's an educator for us was telling a story of how she

19   was walking back to the hotel and she had on her Chi

20   shirt, and this hairdresser approached her that was in

21   town for the IBS, and said, "Oh, Chi.  I love your

22   stuff.  I'm a Chi salon.  I love everything about you.

23   I love your new brush."

24           And this girl who's very well versed -- she owns

25   a salon herself that's all Chi -- said, "What new

Stuart Feldshon
Volume I

1   brush?"

2          And she said, "The new brush, the new brush that

3   you came out with."

4          She goes, "We didn't come out with a new brush."

5          And the stylist said, "Yes.  The Stylus brush."

6          And she said, "No.  That's not our brush.  That

7   belongs to FHI."

8          And she said, "Aren't you guys the same?  That's

9   what the girl at the CosmoProf store said."

10          And she said, "No.  We're two different

11   companies."

12   Q.     Okay.  You said this occurred at the I- --

13   A.     IBS, New York show.

14   Q.     IBS, New York show.  And when was that show?

15   A.     I believe it was March of 20- -- I want to say

16   20- -- let's see.  This is '16.  I have so many things

17   going on.  I'm going to say 2014, March of 2014 maybe.

18          MR. PEARCE:  And that's one where we don't want

19   to you speculate.

20          THE WITNESS:  Yeah.  I'm not sure.

21          MR. PEARCE:  So if you need to do something to

22   confirm.

23          THE WITNESS:  I'll have to look and see because

24   we're not always in the IBS.

25   (BY MR. SEROR)  Do you remember the --

Stuart Feldshon
Volume I

Page 79

1    A.      I can check my calendar now if you want.

2    Q.      Maybe at a break.  And I've got something else

3    that I think may help you as well, and we'll get to

4    that.

5    A.      Okay.

6    Q.      But you said one of your educators had this

7    conversation?

8    A.      Yeah.  She was telling a group of us.

9    Q.      Do you remember this name of this educator?

10   A.      Yes.

11   Q.      What was her name?

12   A.      Maria Santos.

13   Q.      Okay.  And so she was retelling this story, you

14   said, to a group of you?

15   A.      Yes.

16   Q.      And you were in that group?

17   A.      Yes.

18   Q.      Who else was in that group besides you and her?

19   A.      I don't recall.  There was just -- we had a lot

20   of people working that show, so it was a just bunch of

21   people that worked -- I guess people that worked the

22   booth.  I can -- I'd have to look at the roster, but I

23   wasn't paying attention of who was around.

24   Q.      Was this discussion at the Farouk booth?

25   A.      She came back to the Farouk booth, yes.  You

Stuart Feldshon
Volume I

Page 80

1    know, the next day she was telling the story.

2    Q.        Okay.  And Ms. Santos said she was approached by

3    a customer --

4    A.        A hairdresser.

5    Q.        Hairdresser?

6    A.        (Moving head up and down.)  That saw her Chi

7    shirt.

8    Q.        And do all of your educators wear Chi shirts for

9    the show?

10   A.        For setting up, they do, yes.

11   Q.        Okay.  And do you recall if this instance with

12   this hairdresser occurred at the beginning of the show?

13   At the end of the show?

14   A.        It was after set up.  We had finished and she

15   was walking back to her room for the day.

16   Q.        And do these shows last a couple of days?

17   A.        Yeah.  They go Saturday setup, and then Sunday,

18   Monday, Tuesday for IBS.

19   Q.        Okay.  So this would have been, like, on a

20   Saturday evening after set up?

21   A.        Saturday afternoon.  We were done early.

22   Q.        Okay.  And you were at that show?

23   A.        Yes.

24   Q.        Was there a particular reason why you were at

25   that show?

Stuart Feldshon
Volume I

Page 81

1    A.       Actually, I live in Connecticut, and it was an

2    easy show.  We didn't have to fly in any of the VPs to

3    attend, and a lot of our customers were going to be

4    there.

5    Q.       Understood.

6             So Ms. Santos recalled this -- this encounter

7    with the hairdresser, and the hairdresser said that she,

8    the hairdresser, liked the new Chi brush?

9    A.       Yes.

10   Q.       Okay.  And Ms. Santos, I assume, is familiar

11   with Chi products?

12   A.       Yes.

13   Q.       Okay.  And she indicated we don't have a brush?

14   A.       Right.

15   Q.       We don't have a new brush?

16   A.       Right.

17   Q.       And then the customer said, "No.  It's the" --

18   did the customer identify it as the Stylus?

19   A.       Yes.

20   Q.       Okay.  And Ms. Santos says, "Oh, that's not

21   ours"?

22   A.       Correct.

23   Q.       And then she then identify it as an FHI Stylus?

24   A.       Yeah.  She said, "That's FHI."

25            And the stylist said, "Isn't that the same

Stuart Feldshon
Volume I

1    company?"

2             And she said, "No."

3    (BY MR. SEROR)   So Ms. Santos identified it as the

4    Stylus, and then the hairdresser responded --

5    A.       No.  The hairdresser said it was the Stylus, and

6    Ms. Santos knew what that was, and said, "No.  We

7    don't -- that's a different -- that's FHI."

8             And that -- the hairdresser came back at her and

9    said, "Isn't that the same company?"

10            And she said, "No."

11   Q.       I see.

12            Do you know -- you said Ms. Santos knew of the

13   Stylus?

14   A.       Uh-huh.

15   Q.       That's a yes?

16   A.       Yes.

17   Q.       Do you know how she was aware of the Stylus?

18   A.       No.

19   Q.       Okay.  Did you discuss the Stylus with her or

20   any other member of your team at Farouk Systems?

21   A.       No.

22   Q.       Okay.  Do educators at Farouk Systems routinely

23   get educated on other products that competitors have?

24   A.       No.  But they -- a lot of them are salon owners.

25   So I'm sure they see a lot more than they would as

Stuart Feldshon
Volume I

Page 83

 1    educators.  So Maria is a -- I've been to her salon.

 2    She's a salon owner --

 3    Q.      Okay.  And where is it?

 4    A.      In New Jersey.

 5    Q.      I'm sorry?

 6    A.      In New Jersey.

 7    Q.      Okay.  And do you know the name of her salon?

 8    A.      Not off the top of my med.

 9    Q.      But it's in New Jersey?

10    A.      Yes.

11    Q.      And did Maria say anything to you about why this

12    hairdresser thought FHI and Farouk Systems were the same

13    company aside from the Stylus?

14    A.      Yes.

15    Q.      And what did she say in that regard?

16    A.      She said the person at the CosmoProf store that

17    was dealing with her said it was the same company.

18    Q.      So the hairdresser bought the Stylus from the

19    CosmoProf?

20    A.      A CosmoProf store, yes.

21    Q.      Okay.  And CosmoProf is the store that BSG

22    operates?

23    A.      Correct.

24    Q.      Okay.  And did she say when she bought it at the

25    CosmoProf store?

Stuart Feldshon
Volume I

Page 84

```
 1   A.       No.

 2   Q.       Did she say what CosmoProf store she bought it

 3   at?

 4   A.       In Pennsylvania.  I don't have the exact town.

 5   Q.       Okay.  And was the identification of a CosmoProf

 6   store in Pennsylvania part of what the woman told Maria?

 7   A.       Yes.

 8   Q.       Okay.  So she said, "I bought this at CosmoProf

 9   store -- in the CosmoProf store in Pennsylvania"?

10   A.       Yes.

11   Q.       Okay.  And --

12   A.       And Maria asked her, "Where?  Which one?"

13            And she said, "In Pennsylvania."

14   Q.       Maria even asked her which one?

15   A.       Yeah.

16   Q.       Did she ask any other details about the store?

17   A.       No.

18   Q.       And she didn't ask her when she bought it?

19   A.       No.

20   Q.       And then this hairdresser said, "Someone at the

21   CosmoProf store said that Farouk Systems and FHI Heat

22   were the same"?

23   A.       Yes.

24   Q.       Okay.  And did the woman tell Maria anything

25   else about why she thought Farouk Systems and FHI Heat
```

Stuart Feldshon
Volume I

1    were the same, aside from having been perhaps told that

2    by a CosmoProf employee?

3    A.      She was confused -- well, she said when she

4    picked it up, she wasn't sure.  She also was angry

5    because she said she's a Chi salon and she only carries

6    Chi products, that that wasn't a Chi.

7    Q.      So let me back up.  Was that conversation that

8    Maria had -- you said she was going back her hotel?

9    A.      Yeah.  The person was staying at the same hotel

10   and stopped her and saw her Chi shirt.

11   Q.      Okay.  And was this a conversation she had in

12   the lobby?  In the elevator?  Do you know?

13   A.      She just said on her way back to the hotel.  So

14   it could have been outside.

15   Q.      So in addition to being told by the CosmoProf

16   employee that Farouk Systems and FHI Heat were the same,

17   the woman also told Maria that she was confused because

18   she picked up the Stylus, and she thought it was a Chi?

19   A.      Yes.

20   Q.      And did she say why, when she picked up the

21   Stylus, she thought it was a Chi?

22   A.      No.

23   Q.      And did she say she was confused when she picked

24   it up?

25   A.      She said to Maria that when she picked it up,

Stuart Feldshon
Volume I

1    she thought it have a Chi.  She didn't say why.  So she

2    was confused, you know, she didn't hear.  Being a Chi

3    salon, she said that she knows of the new products

4    because her reps come in and show her.  So she was

5    asking questions about this, and when she saw -- she

6    told Maria when she saw the FHI, she asked the person at

7    the store, you know, "What is this?  Is this made by

8    Chi?"

9            And she said, "Yes."

10   Q.      So -- okay.  So I understand.  So she picked up

11   the product --

12   A.      Yeah.

13   Q.      -- and didn't recognize it from her meetings

14   with a Chi sales rep?

15   A.      Correct.

16   Q.      So she then approached the CosmoProf employee?

17   A.      Yes.

18   Q.      And asked for follow up?

19   A.      Yes.

20   Q.      And she said, "Is this a Chi?  Is it not a Chi?"

21   A.      She just asked, "Is this new from Chi?"

22   Q.      Okay.  And the CosmoProf employee said...

23   A.      Yes.

24   Q.      Yes, it is.

25   A.      Yes.

Stuart Feldshon
Volume I

Page 87

1   Q.     Okay.  And did this woman who was talking to

2  Maria identify who this CosmoProf employee was?

3  A.     No.

4   Q.     Okay.  And in fact, did Maria ever get the name

5  of this woman?

6  A.     No.  She got the -- I believe she got the store

7  of where -- which store it was, but she never got the

8  name of woman.

9   Q.     When you say "which store," do you mean which

10  CosmoProf store?

11  A.     Yeah.  What town it was in.

12  Q.     Okay.  And that's in Pennsylvania?

13  A.     Yes.

14  Q.    And what town?

15  A.     I'm not sure.  That's why I don't have that.

16  Q.     I see.  And did Maria -- do you recall Maria

17  telling you the town when she recounted the story the

18  following day?

19  A.     No.  She just said it was in Pennsylvania.

20          I said, "I'd like you to find out the town for

21  me if you can.  Where it was."

22  Q.     Okay.  And do you know if Maria went and tried

23  to track down this woman again?

24  A.     I don't know.

25  Q.     Okay.  Have you ever talked to Maria about this

Stuart Feldshon
Volume I

Page 88

1   since the day after it happened?

2   A.      Yes.

3   Q.      Okay.  And was she ever able to track down this

4   woman again?

5   A.      No.

6   Q.      Okay.  Do you know if she tried to?

7   A.      I don't.

8   Q.      Okay.  Now, did the woman who was confused in

9   the CosmoProf store, did she say whether the items she

10  bought had the name "FHI Heat" on it?

11  A.      I don't recall.

12  Q.      Okay.  And did she say whether -- well, strike

13  that.

14          Did she say what confused her about the product?

15  A.      No.

16  Q.      Okay.  So do you know if she was confused by the

17  letters F-H-I versus the letters C-H-I?

18  A.      I don't.

19  Q.      And Maria didn't ask her about that?

20  A.      No.

21  Q.      Okay.  Do you know if she was confused between

22  FHI -- strike that.

23          Do you know if he was confused for any other

24  reasons other than -- well, no -- strike that.

25          Do you know -- I think I already asked this

Stuart Feldshon
Volume I

Page 89

1    question.

2            You don't why she was confused?

3    A.      No.

4    Q.      Okay.  And Maria didn't ask her?

5    A.      No.

6    Q.      Okay.

7    A.      She was obviously confused because she thought

8    it was a Chi.  I just don't know why.

9    Q.      You don't --

10   A.      I can speculate, but we're not doing that.

11   Q.      We're not.  Thank you.

12           But it could have been -- it could have been the

13   C-H-I versus the F-H-I?

14   A.      Uh-huh.

15   Q.      It could have been the red and black?

16   A.      Uh-huh.

17   Q.      It could have been any number of things?

18   A.      Uh-huh.

19   Q.      Okay.  Yes?

20   A.      Yes, yes.

21   Q.      And you said you talked to Maria about this

22   after -- well, you spoke to her the next day, and you've

23   had occasion to talk to her since then.

24   A.      I spoke to her like once or -- once after that

25   probably about a week or two after that to try to get

Stuart Feldshon
Volume I

Page 90

1    some information, and I wanted the information because I

2    was having a meeting at BSG, and I wanted their people

3    to understand what was what.

4    Q.      So did you go visit Maria?  Did you talk to

5    her --

6    A.      On the phone.

7    Q.      On the phone?  You called her?

8    A.      Yes.

9    Q.      And is it ordinary for you to call individual

10   salon owners in your current role?

11   A.      If I need information, sure.

12   Q.      Okay.

13   A.      And Maria and I go way back.  We worked together

14   for probably about 10 or 12 years.

15   Q.      Understood.

16   A.      She's know me as a regional.

17   Q.      Understood.  But you don't sell goods to Maria

18   directly, right?  They go through a BSG?

19   A.      She buys them through BSG, correct.

20   Q.      So you spoke with Maria about a week later?

21   A.      Yeah.

22   Q.      And what was that discussion about?

23   A.      I just wanted some more information, and she

24   gave it to me.  I did have the name of the store.  I can

25   look at my notes, but I brought that up because I was

Stuart Feldshon
Volume I

1   having a meeting with corporate, and I wanted all their

2   stores to know the difference.  I didn't want this

3   confusion anymore.

4   Q.     So you -- what specific questions do you

5   remember asking Marie {sic} in this follow-up call?

6   A.     Do you know the name of the town the store was?

7   She had given it to me.  I don't know how she got it.

8   You know, maybe she did track that person down.  I don't

9   know.  That's speculation.  I said, "Do you know the

10  person that sold it to her?"

11         She goes, "No."

12         So I brought that information with me.  I -- I

13  don't know if I had a phone call or if I saw him

14  personally, the VP of stores for BS- -- for CosmoProf

15  and said, "Look, here's what happened in Pennsylvania.

16  I don't want it happening anywhere else.  Could you put

17  some type of memo saying that FHI and Chi are two

18  different companies?"

19  Q.     So when you spoke with Maria about this the day

20  after it occurred, at that point she did know the town

21  in Pennsylvania that it was -- that this had occurred

22  in; is that right?

23  A.     Correct.  I had asked her to find it a week

24  later.

25  Q.     And you asked her to follow up?

Stuart Feldshon
Volume I

Page 92

1   A.        Yeah.

2   Q.        Now, did you ask her at the time she first told

3   you about this incident, or did you ask her a week

4   later?

5   A.        I asked her at the time, "If you know the town,

6   that would be great."  And then I followed her up with a

7   phone call, and she had the town.

8   Q.        Okay.  But you don't how she got it?

9   A.        No.

10  Q.        Do you know how many stores CosmoProf has in

11  Pennsylvania?

12  A.        I'd be speculating.

13  Q.        I mean, is it a magnitude of 50?  A magnitude of

14  10?

15  A.        50.

16  Q.        50.  Okay.  And that's across the whole state?

17  A.        Across the whole state, yes.

18  Q.        And Marie {sic} then gave you town --

19  A.        Yes.

20  Q.        -- that CosmoProf store was in?

21  A.        Yes.

22  Q.        And what was that town?

23  A.        I -- I don't remember.

24  Q.        But you said you have written notes of that

25  call?

Stuart Feldshon
Volume I

Page 93

1    A.       I believe so.  I'd have to go back.  It either

2    happened two years ago or -- I have to check my

3    calendar.

4    Q.       Okay.  Well, you know, let's clarify that,

5    because if you look at Exhibit 41, and I'd ask you to

6    turn to Page 7.  And on the bottom of that, we

7    actually -- again, we're talking about interrogatories

8    -- and we asked:  Identify instances of confusion.

9             And it references a March 15th.

10   A.       Maybe that was it.

11   Q.       Trade show in New York.  Does that refreshing

12   your recollection as to this occurring in March of 2015?

13   A.       I'd have to check my calendar.  I don't know who

14   said -- who gave you this answer.  I don't know.

15   Q.       Well, let me ask you this:  Did you --

16   A.       It could have been March of 2015 or 2014.  I'm

17   not sure.

18   Q.       Okay.  You said that's something you can check

19   at a break?

20   A.       Yeah.

21   Q.       Okay.  So in addition to Marie giving you -- I

22   apologize.  I've been saying Marie.  It's Maria, but I

23   think we're talking about the same person here.

24   A.       Yes.

25   Q.       In addition to Maria giving you the name of the

Stuart Feldshon
Volume I

Page 94

1    town on that follow up call a week later, did she give

2    you any other information on this incident?

3    A.      No.

4    Q.      How long was that call?

5    A.      Not long.  About five or ten minutes, tops.

6    Q.      And was the only purpose of that call to discuss

7    this incident?

8    A.      Yes.

9    Q.      Okay.  And if the only thing she gave you was

10   the name of this town, did you discuss anything else to

11   take up that five or ten minutes?

12   A.      Probably personal things.  "How's it going?"

13   You know, I know her and her husband.

14   Q.      I see.  Okay.  So then you said that you took

15   that information.  You took it to the VP of stores for

16   BSG.

17   A.      Correct.

18   Q.      And who's that?

19   A.      A gentleman by the name of Mike Flahaven.

20   Q.      Can you spell that?

21   A.      F-L-A-H-A-V, either E-N or A-N.  I think it's

22   A-N.

23   Q.      Okay.  And I think you said that you were

24   meeting with him shortly after that follow-up call with

25   Maria?

Stuart Feldshon
Volume I

Page 95

1    A.        Yes.  It was either a meeting or a phone

2    meeting.

3    Q.        And did you recount to Mr. Flahaven this story?

4    A.        Yes.

5    Q.        And did you tell him all the details you told

6    us?

7    A.        Yes.

8    Q.        Did you tell him any details that you haven't

9    testified to today?

10   A.        No.

11   Q.        Okay.  And did you leave anything out that you

12   testified to today that you didn't tell him?

13   A.        I got you confused.

14   Q.        I apologize.  Halfway through that question I

15   realized I think I confused myself.

16             What I'm wondering is:  Did all the facts you

17   testified to today, did you convey that to Mr. Flahaven?

18   A.        Just the Maria Santos segment.  That's it.

19   Q.        Yes.  Okay.  And obviously nothing else you've

20   testified to today.  That's a fair point.  I'm going to

21   clarify that.

22             With respect to the -- the incident with Maria

23   Santos, did you tell him all the facts that you've

24   recounted this morning?

25   A.        Yes.

Stuart Feldshon
Volume I

1    Q.       Okay.  What was his response?

2    A.       I will look into it and make sure all the stores

3    know the difference.  That's what I was looking for.

4    Q.       And do you know if he did that?

5    A.       He's usually -- he's usually right on point.  I

6    didn't check with him and say, "Did you that?"  I

7    haven't had any instances since that I know of.

8    Q.       Okay.  And did you ever have any follow-up

9    conversations with him on this all at?

10   A.       No.

11   Q.       Okay.  So just that one conversation?

12   A.       Just that one conversation.  He's usually a guy

13   that gets it done.

14   Q.       Okay.  And that conversation, was it about five

15   or ten minutes?

16   A.       Yeah.

17   Q.       Okay.  At least the portion of that discussion

18   relating to the Marie Santos --

19   A.       Yes, probably five minutes.

20   Q.       Okay.  And you talked about other things --

21   A.       Sure.

22   Q.       Okay.

23   A.       It's not easy to get him on the phone, so I put

24   an agenda together.

25   Q.       You took advantage when you get him?

Stuart Feldshon
Volume I

1    A.      Yes.

2    Q.      And -- and you said you haven't talked to him

3    about it since?

4    A.      No.

5    Q.      And aside from that one follow-up call that

6    you've had with Maria, have you talked with her about

7    that call since this incident?

8    A.      No.

9    Q.      Have you talked to her about other things?

10   A.      No.  No, I haven't.

11   Q.      But you certainly haven't talked to her about

12   that incident?

13   A.      No.

14   Q.      Have you now told me everything you know about

15   that instance at the hotel in New York regarding this

16   confusion?

17   A.      Yes.

18   Q.      Okay.  There's nothing you've left out?

19   A.      No.

20   Q.      Okay.  So besides that one instance of

21   confusion -- well, strike that.  Actually let me back

22   up.

23           Due tell anybody at Farouk Systems about this

24   incident?

25   A.      Yes.

Stuart Feldshon
Volume I

Page 98

1    Q.        Who?

2    A.        I told Basim.  I told just about -- I guess I

3    told Andre, just tell them about the, you know, how we

4    have a problem here, and that I got separation from the

5    stores.  That was my main goal was to make sure all the

6    store people knew what FHI was and what Chi was.

7    Q.        So when you say you "got separation," you mean

8    that you requested BSG to make that clarification?

9    A.        Yes.

10   Q.        Okay.  And was the purpose of you telling this

11   to either Mr. Chiavelli or Basim just to report on what

12   was going on?

13   A.        Correct.

14   Q.        Okay.  Did you ever have any back and forth with

15   them?

16   A.        Not really.  Just, you know -- you know, we

17   got -- we got to make sure that doesn't happen and make

18   sure he follows up.  I said he told me he would.  That's

19   good enough for me.

20   Q.        Okay.  And that seemed good enough for them?

21   A.        Yeah.  At the time, yes.

22   Q.        Did they ever ask you to follow up?

23   A.        No.

24   Q.        Okay.  And did you recount for them, either

25   Basim or Mr. Chiavelli, the whole story that you've told

Stuart Feldshon
Volume I

1   us?

2   A.      Sure.

3   Q.      Okay.  And did you do this during a call or an

4   in-person meeting?

5   A.      In-person meeting just going over, you know,

6   going over how the IBS show went, and that stood out.

7   Q.      Kind of like an update?

8   A.      Yeah.

9   Q.      Okay.  And aside from that meeting, and was it a

10  meeting with both of them at the same time?

11  A.      Separate.

12  Q.      Okay.  And besides those two meetings, did you

13  ever have the occasion to speak with either one of them

14  again about the Maria Santos incident?

15  A.      When the lawsuit was going into effect, yes.

16  Q.      Okay.  And what discussions did you have at that

17  point in time?

18  A.      I just repeated, you know, what happened, and he

19  goes, "Oh, that's right."

20  Q.      Did reach out to you or did you --

21  A.      I told him when I heard about the lawsuit.  I

22  said, "Well, there's -- and, you know, there was

23  confusion."  And I said, "Yeah.  We had that confusion

24  in New York."

25          And he said, "Oh, that's right."

Stuart Feldshon
Volume I

1    Q.      So you'd otherwise heard about the lawsuit?

2    A.      Yeah.

3    Q.      And do you recall how you heard about this

4    lawsuit?

5    A.      Just through coming to work and hearing about

6    it.

7    Q.      Okay.  And then at that point you reached out

8    to -- was it Mr. Chiavelli or Basim?

9    A.      I reached out to both of them.

10   Q.      Okay.  Separately?

11   A.      Well, no.  I'm sorry.  To Mr. -- I had told

12   Basim -- I had told them about it after the show.  When

13   I heard about the lawsuit, that was on the later

14   occasion.

15   Q.      Okay.  And --

16   A.      And I had mentioned it to Basin.

17   Q.      Okay.  So -- and you told us that you had

18   separate conversations with each of them after the

19   show --

20   A.      Yes.  Just -- it just worked out that way.

21   Q.      Okay.  Kind of an update?

22   A.      Yeah.

23   Q.      Okay.  And then at some point in time later, you

24   learned about lawsuit?

25   A.      Correct.

Stuart Feldshon
Volume I

1    Q.       And then you reached out Basim?

2    A.       And -- well, when I saw Basim, it came into

3    context.  He was talking about the confusion, and I

4    said, "Yeah.  Remember the instance in New York."

5    Q.       And he said, "Oh, that's right"?

6    A.       That's right.

7    Q.       And did it appear that he forgot about that?

8    A.       No.

9    Q.       Okay.  And you said you were having a

10   conversation with him in the context of confusion?

11   A.       Just on the -- he had -- we had talked about the

12   lawsuit and the confusion, you know, people were having,

13   and then I brought up New York.

14   Q.       And --

15   A.       Confusion was put in there, yes.

16   Q.       Okay.  And was this an in-person meeting or on

17   the phone?

18   A.       In person.

19   Q.       Okay.

20   A.       Just -- and it was just a casual coming in,

21   saying hello, and him telling me what was going on.

22   Q.       And one of the things that he told you going on

23   was the lawsuit?

24   A.       Yeah.  I had heard about it just from being in

25   the office.

Stuart Feldshon
Volume I

Page 102

1   Q.      Okay.  And then you guys had in informal

2   discussion about it?

3   A.      Yes.

4   Q.      And then you said, "Oh, that's right.  You

5   remember that New York thing?"

6   A.      Right.

7   Q.      And he's like, "Oh, yeah.  That's right"?

8   A.      Uh-huh.

9   Q.      Any other conversations you had with him on that

10  topic?

11  A.      No.

12  Q.      Okay.  And was that a short conversation?

13  A.      Yeah.

14  Q.      So we've now talked about this issue with Maria

15  Santos.  Are you aware of any other instances of

16  confusion besides that one?

17  A.      No.

18  Q.      Okay.  And in preparation for today's testimony

19  and trying to figure out if there's been instances of

20  confusion, who did you talk to to see if there'd been

21  any?

22  A.      Nobody.

23  Q.      Okay.

24  A.      Oh, strike that, if I can.  I reached out to

25  customer service if they'd had any instances of

Stuart Feldshon
Volume I

 1    confusion.

 2    Q.       And when did you do that?

 3    A.       Yesterday.

 4    Q.       Who did you talk to in customer service?

 5    A.       I emailed Norma Smith who runs our customer

 6    service.

 7    Q.       Did she run customer service for the whole

 8    company?

 9    A.       Yeah.

10    Q.       She's based here in Houston?

11    A.       Yes.

12    Q.       You said you emailed her?

13    A.       Yes.

14    Q.       And what did you ask Norma?

15    A.       I just said, "Have you gotten any reports on any

16    confusion between FHI and Chi?"

17             And I asked the girl that works for her that's

18    in charge of returns, Brandy Campbell, have you gotten

19    any FHI back in returns or damages that people thought

20    they were giving Chi back?"

21             And the answer was "no" to both.

22    Q.       So I didn't catch Brandy's last name?

23    A.       Campbell.

24    Q.       And she's in charge of returns?

25    A.       Returns and -- yeah.

Stuart Feldshon
Volume I

Page 104

1    Q.      Is that --

2    A.      Customer returns.

3    Q.      Product returns?

4    A.      Yes.

5    Q.      Okay.  And is she under the customer service

6    umbrella?

7    A.      Yes.  She reports to Norma.

8    Q.      And you sent separate emails to Norma and

9    Brandy?

10   A.      Yes.  Well, with Brandy I copied Norma so

11   that...

12   Q.      And both Norma -- well, let's back up.  Norma

13   indicated that she was aware of no reports of customers

14   being confused?

15   A.      Correct.

16   Q.      Okay.  And brandy indicated that she had no

17   knowledge or there'd been no returns to Farouk Systems

18   of FHI Heat products?

19   A.      Correct.

20   Q.      Okay.  How long, if you know, has Norma been in

21   charge of customer service?

22   A.      Over ten years.

23   Q.      And with what about Brandy being in charge of

24   returns?

25   A.      Five or six.

Stuart Feldshon
Volume I

1    Q.      Years?

2    A.      Yes.

3    Q.      Do you know if the company keeps logs or

4    journals of customer service calls it gets or emails it

5    gets?

6    A.      No.

7    Q.      You don't know or they don't?

8    A.      I don't know.

9    Q.      Okay.  Aside from speaking with Norma and

10   Brandy, did you reach out to anyone else to determine if

11   there's been my confusion?

12   A.      No.

13   Q.      Okay.  So the only knowledge, the only confusion

14   your aware of is this Maria incident that we've talked

15   about?

16   A.      Correct.

17   Q.      Okay.  I'd like to move on to the next topic,

18   which I actually think we've covered interspersed

19   throughout other things.  So -- and this topic is No.

20   38, and it relates to the sales channels through which

21   Farouk Systems sell its products and that includes trade

22   dress.

23           So we've talked about the professional channels

24   that those products are sold in, and you oversee that?

25   A.      Yes.